NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0760n.06
Filed: October 26, 2007

No. 06-4542

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WENDY VEHAR, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| COLE NATIONAL GROUP, INC.; LUXOTTICA | ) | |
| U.S. HOLDING CORP.; LUXOTTICA GROUPS, | ) | |
| S.P.A.; LES SNYDER; and STEVE HURD, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| _____ | ) | |

BEFORE: MOORE and GRIFFIN, Circuit Judges; and TARNOW, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff Wendy Vehar appeals the district court's grant of summary judgment for defendants regarding Vehar's sex discrimination claims under the federal Equal Pay Act, 29 U.S.C. § 206(d), and the analogous Ohio Equal Pay Act, OHIO REV. CODE § 4111.17, her sex discrimination claim under Title VII (42 U.S.C. §§ 2000e - 2000e-17) and OHIO REV. CODE § 4112, her hostile work environment claim under Title VII and OHIO REV. CODE § 4112, and her retaliation claim under Title VII and OHIO REV. CODE § 4112. Because there are genuine issues of material fact that render

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

summary judgment improper, we reverse the decision of the district court and remand for further proceedings.

I.

Wendy Vehar was hired at Cole Vision Corporation's ("Cole") Twinsburg, Ohio, office in February 2001. Vehar originally began working for Cole as a Data Analyst in the Systems Management Department at a salary of $46,000. Her qualifications for the position included a bachelor's degree in mathematics from the University of Toledo, with a minor in computer science. In addition, she possessed six years, eight months' experience as a computer programmer, working for U.S. Standard Sign Company from 1986 to 1989 and ADP Dealer Services from 1989 to 1992. Through her work at U.S. Standard Sign Company and ADP, Vehar acquired extensive experience with database management systems such as dBase, operating systems such as Unix, and computer programming languages such as C++ and SQL.

During the eight-year period immediately before her employment at Cole, Vehar cared for her four children on a full-time basis. In preparation for her return to the workforce, Vehar familiarized herself with Microsoft Visual Basic and Java and enrolled in a SQL database programming course. Although Vehar did not consider the Data Analyst position to be commensurate with her education and experience, she hoped to use the position to get her "foot in the door" at Cole. Vehar's assessment of her qualifications vis-a-vis the analyst position was apparently shared by her supervisor in the Systems Management Department, Lyle Turner, who described her as overqualified for the position.

During her first year in Cole's Systems Management Department, Vehar was called upon to develop the guide for the Pearle Business System ("PRO"), the application code for Cole's in-house language "PROGRESS." Vehar's guide became known as the "PRO bible" within the company. Due to the fact that the PRO system was relatively new to Cole, Vehar provided informal instruction to other employees, including her supervisor Lyle Turner, concerning the use of the system. Turner stated that Vehar had "truly made a difference with [her] efforts and perseverance . . . and taken the lead to bring us all to common understanding of PRO processing/flow." Through her mentoring on the PRO system, Vehar came into contact with the Retail Systems Group, headed by Les Snyder. She was invited to attend the group's meetings regularly and perform some information technology ("IT") related tasks. After her first year, Vehar was given a one-percent raise, bringing her salary to $46,400.

In June of 2002, Vehar was offered a lateral transfer to the Retail Systems Group. Vehar asserts that, although her employment offer letter, signed by Snyder and Human Resources, stated that she was to be hired as a "Programmer Analyst," she was actually appointed to the lower position of "Programmer II" without her consent. Moreover, she remained in pay grade 28, at a salary of $46,400, in this new position. This salary was below the midpoint for the $38,100 to $57,000 salary range applicable to pay grade 28.

The Retail Systems Group was responsible for maintaining all computer technology in approximately 1,900 Pearle Vision, Sears Optical, Target Optical, and BJ's Optical stores. This technology included operating systems, point-of-sale applications, and order entry applications.

Vehar was assigned primary PRO support duties within four weeks of her start in the Retail Systems Group.

In this group, Vehar worked with fellow programmers Erich Leipold and Dave Crosley. Cole hired Leipold as a Programmer Analyst in May of 2000. This position had a salary grade of 29. At the time of his hire, Leipold was paid $60,000. By September of the next year, Leipold had been promoted to Senior Programmer Analyst, increasing his salary to $67,307.63. At the time of his initial hire, Leipold had nine years of industry experience, but no college degree.[1] By his own admission, Leipold demonstrated weak or nonexistent project management and communication skills during his tenure at Cole. Snyder consistently evaluated him as "M" for "meets expectations" commensurate with his position. In July 2004, just before his eventual departure from Cole, Leipold was promoted to Senior System Analyst, earning $78,622.

Crosley was hired as a Systems Analyst, a position superior to that of Programmer II, about six months prior to Vehar's start date. He listed Snyder as a reference on his application to Cole. As a Systems Analyst, Crosley's salary grade was 31 and he earned $68,500 annually. He held a technical degree and eight years of experience prior to his time at Cole (JA 66). After serving three years as an independent consultant to Cole, from 1997 to 2000, Crosley was hired as a full time employee. In his position as a Systems Analyst, Crosley acted in a supervisory capacity to Leipold and Vehar. Snyder rated Crosley as "M" or "meets expectations" commensurate with his position. Crosley's supervisory role continued until about February of 2003, when he was functionally

---

[1]Leipold earned his college degree in 2001, after his hire at Cole.

demoted and replaced as supervisor. He continued on as a Senior Programmer Analyst, working alongside Leipold and Vehar and earning $73,733.40. At this time, Vehar was earning $46,460.

From June 2002 onward, Vehar and Leipold worked together and reported to the same manager. Snyder described their major work responsibilities as including the writing of code and retail store support. Cole regarded this latter duty as the "most important role" of the Retail Systems Group. After Crosley's demotion in February 2003, all three programmers reported to the same supervisor and were tasked with writing code and providing support to retail stores. The Retail Sales Group was responsible for supporting and maintaining the systems of Pearle Vision and RIS stores, with two subgroups assigned to service each line of stores respectively. Crosley, Leipold, and Vehar were assigned to the Pearle Vision group. Between November 2002 and November 2004, Vehar authored more than 36 percent of Pearle Retail Systems development changes, while Crosley authored 34 percent and Leipold 26 percent.

In addition to store support, the Retail Systems Group was assigned various projects, which were categorized as either "low priority" or "high priority." Vehar states that while Leipold and Crosley were assigned to some low priority projects, she was assigned to only high priority projects. Vehar also continued to be responsible for the PRO phases of various projects throughout the company. Her work with the eBusiness group on a web services project prompted an invitation for Vehar to transfer to the group, which was subsequently blocked by Human Resources. Other projects required the collaboration between the three programmers. For the Perpetual Inventory Project and RGIS Inventory Project, Vehar assumed a leadership role and assigned, supervised, and

corrected Crosley's project work. Vehar was eventually promoted to Programmer Analyst in March of 2003, moving her into pay grade 29, and earning a salary of $48,783. This figure is near the bottom of the $42,700 to $64,000 salary range for a pay grade of 29.

In October of 2003, Vehar complained to Snyder that she received less pay than her male coworkers and that she sought a raise. Snyder responded that Vehar needed "to be patient these things take time." Snyder did not indicate at the time that Leipold's and Crosley's pay was a product of greater experience and/or skills. Snyder eventually discussed Vehar's complaints with his supervisor, John Broerman, and learned that Vehar had already discussed the matter with Broerman. Broerman looked into Vehar's complaint and later reported back to Snyder that Vehar's pay would not be increased because of her promotion to Programmer Analyst three months earlier. Vehar continued to work in the Retail Systems Group and received an "E" or "exceeds expectations" performance review. This resulted in a six percent merit increase in pay, bringing Vehar's salary to $51,709.

Vehar believes that she suffered retaliation from her coworkers within the Retail Systems Group due to her October 2003 complaint and because of her sex. Specifically, she contends that she was denied training, even when the training was already paid for. Vehar felt "ostracized" from her peers and excluded from social events, as Snyder, Leipold and Crosley golfed routinely together and went out for drinks. Vehar also felt that Snyder fostered a work environment that was hostile towards women. Snyder referred to Leipold and Crosley as his "smart guys," while referring to

Vehar as "disloyal" and as a "data bitch." In addition, he forwarded jokes that Vehar considered sexist, including one that referred to all women as "witches."

In July 2004, Luxottica U.S. Holdings Corporation ("Luxottica") purchased Cole National Vision Group. In October of 2004, Luxottica announced its plans to close the Twinsburg office. At that same time, Luxottica assumed all management responsibility at the Twinsburg location. All employees at the Twinsburg office were given the opportunity to apply to positions in Luxottica's Cincinnati headquarters. Several employees, including Leipold and Crosley, took this opportunity to pursue other job opportunities, while Vehar elected to stay at Cole.

On November 8, 2004, Vehar reiterated her concern over the apparent pay discrepancy between her and her male coworkers in a letter to Snyder, Broerman, and Human Resources Director Steven Hurd. In addition to her complaints about unequal pay, Vehar stated that she felt ostracized from coworkers within her department because she was not invited to social events and that she felt her coworkers could not communicate freely with her. Vehar also believed that she was denied supplemental training in computer languages and that she was required disproportionately to carry the support pager on weekends, which required her to be on call if a computer problem arose. This letter was forwarded on to Sheryl Fleming, Luxottica's Human Resources Manager. She investigated Vehar's complaints and determined that Vehar was denied training because of Luxottica's general uncertainty about the future role of the IT department. On November 16, 2004, Vehar met with Fleming regarding her concerns and was told that if she was uncomfortable with her work situation that she could "leave today."

Vehar found an online job listing for Luxottica's Cincinnati office, which advertised a position functionally the same as the one she had been performing at the Twinsburg office. This position was never offered to Vehar, despite the fact she had been actively seeking placement in the Cincinnati office. Defendants state that Vehar was not offered the job because Luxottica determined that she was overqualified for the position. Vehar then applied for work outside of Cole and found a job at National City Bank as a "Project Lead II" at a salary of $73,000, thirty percent higher than her highest salary at Cole.

On April 11, 2006, Vehar filed a complaint in the Court of Common Pleas, Summit County, Ohio, alleging sex discrimination under the federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the analogous Ohio Equal Pay Act ("Ohio EPA"), OHIO REV. CODE § 4111.17, sex discrimination under Title VII and OHIO REV. CODE § 4112, hostile work environment under Title VII and OHIO REV. CODE § 4112, and retaliation under Title VII and OHIO REV. CODE § 4112. Defendants timely removed the case to the United States District Court for the Northern District of Ohio. Defendants, on May 3, 2006, filed a Motion for Summary Judgment on each of Vehar's claims. The district court granted this motion in its entirety. On November 3, 2006, Vehar filed her notice of appeal.

II.

We review a district court's grant of summary judgment de novo. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "The decision below may be affirmed only if the pleadings, affidavits, and other submissions show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Thomas v. Miller*, 489 F.3d 293, 297 (6th

Cir. 2007) (quoting FED. R. CIV. P. 56(c)). A dispute over a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, we must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 497 (6th Cir. 2007). "Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (internal citations omitted).

Vehar seeks relief under both the federal EPA and the analogous Ohio EPA.[2] Claims brought pursuant to OHIO REV. CODE § 4111.17 are subject to the standards applied under the federal EPA. *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 161 n.6 (6th Cir. 2004). As such, we will address the federal and Ohio equal pay claims together.

To establish a prima facie case of wage discrimination under the EPA, the plaintiff must demonstrate that an employer pays "different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

---

[2]Additionally, although Vehar has appealed the district court's grant of summary judgment as a whole, she has not addressed her OHIO REV. CODE § 4112.02 hostile work environment and retaliation claims on appeal. These claims are therefore deemed waived. *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 431 n.1 (6th Cir. 2004). Similarly, Vehar alleged additionally that another employee, Matt Gaudio, was paid more for equal work. The district court found that Vehar failed to meet her prima facie burden as to this point. Vehar has not addressed this issue on appeal, and it is therefore also deemed waived. *Id.*

performed under similar working conditions.'" *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th

Cir. 1992) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). The job functions

of two individuals need not be identical to be considered "equal work" under the EPA. *Beck-Wilson*

*v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing *Shultz v. Wheaton Glass Co.*, 421 F.2d 259,

265 & n.10 (3d Cir. 1970)). Instead, there only needs to be a "substantial equality of skill, effort,

responsibility, and working conditions." *Birch*, 392 F.3d at 161 (quoting *Odomes v. Nucare, Inc.*,

653 F.3d 246, 250 (6th Cir. 1981)). The question of whether the work of two employees is

substantially equal "is determined on a case-by-case basis and 'resolved by an overall comparison

of the work, not its individual segments.'" *Beck-Wilson*, 441 F.3d at 359-60 (quoting *Odomes*, 653

F.2d at 250). The focus at the prima facie stage is on actual job requirements and duties, rather than

job classifications or titles. *Beck-Wilson*, 441 F.3d at 362 (citing *Brennan v. Owensboro-Daviess*

*County Hosp.*, 523 F.2d 1013, 1017 & n.7 (6th Cir. 1975)); *see also* 29 C.F.R. § 1620.13(e)

("Application of the equal pay standard is not dependent on job classifications or titles but depends

rather on actual job requirements and performance.")

The district court was correct in finding that Vehar successfully established a prima facie case

of sex discrimination under the federal and Ohio EPAs. The record supports the conclusion that

Vehar, Crosley, and Leipold performed substantially equal work. All three worked as programmers

in Cole's Retail Systems Group and reported to the same manager. They were assigned to the

PRO/Pearle Support subgroup and provided additional support to the RIS Support subgroup, which

they did with no distinction between duties or responsibilities. The programmers were responsible

additionally for writing code and authoring development changes to the system. Vehar, Crosley, and Leipold were also responsible for completing a variety of projects, on which they sometimes collaborated. The programmers were called upon to perform both programming and leadership duties in these projects. For one such assignment, a Perpetual Inventory Project and RGIS Inventory Project, Vehar assumed a leadership role, supervising and assigning work to Crosley. Vehar has offered sufficient evidence that she performed work substantially equal to that of Crosley and Leipold.

It is also plain that Vehar received less pay for this comparable work. When Vehar first came to the Retail Support Group, she was classified as a Programmer II, despite Cole's earlier representation that she would begin as a Programmer Analyst. She was paid $46,400 in this role. Leipold was allowed to begin his employment as a Programmer Analyst at a salary of $60,000, a twenty-percent increase over the pay Vehar received in the same position. By September of 2001, Leipold was promoted to Senior Programming Analyst, earning $67,307.63. Crosley, while a Systems Analyst, earned $68,500. After the restructuring of the Retail Support Group and his functional demotion to Senior Programming Analyst, Crosley earned $73,733.40. This indicates that not only were the employees performing substantially equal work under disparate job titles, leading to an imbalance in pay, but that even within equivalent job titles, Vehar received less pay than her male counterparts. The district court was thus correct in ruling that Vehar established a prima facie case of sex-based pay discrimination.

Once a plaintiff establishes a prima facie case of wage discrimination, the burden shifts to the defendant to prove that the difference in wages is justified by one of the affirmative defenses enumerated in 29 U.S.C. § 206(d)(1). *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005); *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 800 n.7 (6th Cir. 1998) ("In an EPA case, the defendant *always* bears the burden of proving that its proffered reason is the true basis for the pay differential."). These defenses are: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) any factor other than sex. *Id.* at 799 (citing *Corning Glass Works*, 417 U.S. at 196-97). *See also Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000) (citing 29 U.S.C. § 206(d)(1)). Here, defendants assert the fourth factor as the basis for Vehar's lower salary. This "catch-all" provision "does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) (citations omitted). The defendant bears the heavy burden of proving that a factor other than sex is the basis for a wage differential; in other words, it must be shown that the factor of sex provides absolutely no part of the basis for the pay disparity. *Beck-Wilson*, 441 F.3d at 365.

The district court ultimately held that defendants satisfied the fourth factor, in essence ruling that there was no genuine issue of material fact concerning whether pay was due to a factor other than sex. In reaching this conclusion, the district court mainly relied on Crosley's and Leipold's additional work experience. Although experience and skills may justify a pay differential in some instances, *Balmer*, 423 F.3d at 612, here the differences are not significant enough to support

summary judgment.  On this record, we hold that a reasonable jury could determine that sex played

a role in determining Vehar's wage.

Cole's description of the requirements for the programmers' respective positions set forth

the following educational and work experience prerequisites:

Programmer Analyst (Salary Grade 29):  Position requirements include a Bachelor's degree or equivalent experience typically achieved with 5+ years work experience. . . .

* * *

Senior Programmer Analyst (Salary Grade 31):  Position requirements include a Bachelor's degree or equivalent experience typically achieved with 7+ years work experience. . . .

* * *

Systems Analyst (Salary Grade 31):  Position requirements include a Bachelor's degree or equivalent experience typically achieved with 10+ years work experience. . . .

These position listings indicate that education is a desired trait in employees, an attribute that

can serve as a substitute for relevant work experience.  Here, Vehar is the only programmer of the

three to hold a degree from a four-year institution at the time of her hire.  It appears, however, that

her degree was apparently not factored into either pay or promotion considerations.  When Vehar

first questioned Snyder about her disparate pay, he did not state that Leipold's or Crosley's larger

salaries were in any way based on their greater experience.  Further, at the time Leipold was hired,

he possessed nine years of experience, which qualified him for the position of Programmer Analyst.

At the time of Vehar's transfer to Snyder's group, she possessed approximately eight years of

experience and a four-year degree, yet she was only hired on as a Programmer II, a position below

- 13 -

her education level and experience. By the time of her promotion to Programmer Analyst in March of 2003, she had nearly nine years of experience, the same amount of experience Leipold possessed at the time of his hire. Despite her roughly equal experience and superior education, Vehar earned almost twenty percent less than Leipold in the same position.

Crosley possessed more experience than Vehar, but again, he did not have a comparable educational background. Moreover, the record indicates that Crosley's experience did not translate to increased performance or productivity. When Vehar first joined the Retail Systems group, Crosley, as a Systems Analyst, acted in a supervisory role over Vehar and Leipold. After his demotion to Senior Programming Analyst and the elimination of these supervisory duties, Crosley would earn even more. Crosley operated in the same work space as Vehar and Leipold and performed substantially equal tasks. Vehar actually supervised him on some project work, with Crosley performing some of the less complicated programming changes. While Crosley was under her supervision, he occasionally submitted his work late. Based on his observations of Crosley's work product, Leipold regarded Crosley as "weak" in terms of knowledge of programming standards.

Defendants repeatedly emphasize the "more advanced skills" of both Crosley and Leipold as justifying the difference in pay among the three programmers. It is true that Crosley, Leipold, and Vehar all possessed diverse and varied aptitudes. For example, unlike Vehar, her supervisor Snyder is not proficient in Linux, Unix, C++, or Java. We recognize the difficulty in making qualitative distinctions in such a narrow and technical field of expertise, particularly at the summary judgment stage. Indeed, the invitation to determine whether C++ is more useful than Java for a particular

programming task is one we must decline. Analysis of such technical specifics is better suited to trial, where the district court may receive testimony and witnesses can be cross-examined.

Similarly unavailing is defendants' argument that Vehar's experience prior to her employment at Cole was outmoded or otherwise obsolete. The record suggests the opposite conclusion, as Vehar consistently garnered "E" (exceeds expectations) performance ratings during her time in the Retail Systems group. As Leipold described: "All programming languages have pretty much the same foundation. . . . If you understand one in terms of the linear programming language, you can probably understand three, four, five or six. . . . It doesn't take too long to transition [into a new language]." He further stated that based on his own experience, proficiency in unknown languages can be acquired on the job. This view is supported by Vehar's quick comprehension of the "PRO" application code for Cole's mainframe language, "PROGRESS."

Although it is clear that Leipold and Crosley possessed more experience than Vehar, defendants have not met their burden of establishing that this distinction was the reason for the pay disparity. For example, defendants have not demonstrated that Cole valued work experience more than other attributes, such as education, in determining salary. Indeed, the job descriptions of Programmer Analyst, Senior Programmer Analyst, and Systems Analyst suggest that education could serve as a substitute for five, seven, or even ten years of experience. To grant summary judgment on the basis of an identified distinction, without requiring proof of a qualitative difference, essentially nullifies the burden of proof on this issue.

Even if we were to conclude that defendants successfully showed that no reasonable jury could find that sex played a role in determining Vehar's salary, Vehar has met her burden of production creating a triable issue that the reasons offered by defendants are pretextual. *See Balmer*, 423 F.3d at 613 (citing *Buntin*, 134 F.3d at 800 n.7). Here, both Crosley and Leipold had a social relationship with their supervisor Snyder that extended beyond the workplace, as the three golfed and had drinks together. Additionally, Crosley listed Snyder as a reference on his employment application. Snyder's comments, referring to Vehar as a "data bitch" and joking that "all women are witches," are instances of gender animus and, although perhaps anecdotal, create a triable issue as to whether her salary was based to some degree on sex and whether Leipold's and Crosley's experience was mere pretext for the pay disparity.

III.

The district court observed that in Vehar's complaint, she alleged sex discrimination in violation of Title VII and Title VII's Ohio state corollary, OHIO REV. CODE § 4112.02(A), yet only discussed § 4112.02 in her Opposition to Defendant's Motion for Summary Judgment. Ohio has held that federal case law interpreting Title VII claims is generally applicable to cases involving alleged violations of § 4112.02(A). *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005). Noting the same, the district court addressed Vehar's Title VII and § 4112.02(A) claims together. On appeal, Vehar again raises explicitly only a claim of sex discrimination under § 4112.02(A), referencing Title VII solely in

terms of a legal standard for her state claim. At this juncture, Vehar has waived her Title VII claims, *see Derungs*, 374 F.3d at 431 n.1, although her state claim remains viable and is addressed under the Title VII framework.

We have held previously that a Title VII claim of wage discrimination is coextensive with a claim under the EPA insofar as the former incorporates the EPA's affirmative defenses. *Beck-Wilson*, 441 F.3d at 369 (citing *Washington County v. Gunther*, 452 U.S. 161, 167-71 (1981)). As such, a defendant may avoid liability under Title VII if it can establish one or more of the EPA's affirmative defenses. *Id*. (citing *Odomes*, 653 F.2d at 251). This court has held that the converse is also true. When a plaintiff successfully defeats a defendant's motion for summary judgment pertaining to her EPA claim by raising a genuine issue of material fact as to defendant's affirmative defenses, she also defeats the defendant's motion for summary judgment concerning a parallel Title VII claim. *Id.* (citing *Buntin*, 134 F.3d at 801). Thus, because defendants are unable to prevail on their summary judgment motion regarding Vehar's EPA claims, they are not entitled to summary judgment on Vehar's § 4112 claim.[3]

IV.

---

[3]We are aware that the EPA's and Title VII's burdens of proof are not wholly interchangeable and in the rare, very close case, a plaintiff can succeed on an EPA claim while failing simultaneously to establish a Title VII claim. *See, e.g., Woods v. The Univ. of the South*, No. 4:00-cv-16, 2001 WL 34079320, at *6-7 (E.D. Tenn. Nov. 8, 2001). This circuit, however, has rejected this logic as "overly technical." *Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990). More importantly, the present matter does not hinge on such a close set of facts as to require separate analysis under the EPA and Title VII.

The judgment of the district court is hereby reversed and the case is remanded for further proceedings consistent with this opinion.