RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEE BRIGGS,

*Plaintiff-Appellant*,

v.

UNIVERSITY OF CINCINNATI,

*Defendant-Appellee*.

No. 20-4133

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:18-cv-00552—Matthew W. McFarland, District Judge.

Argued: June 10, 2021

Decided and Filed: August 26, 2021

Before: MOORE, CLAY, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Katherine Daughtrey Neff, FREKING MYERS & REUL LLC, Cincinnati, Ohio, for Appellant. Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Katherine Daughtrey Neff, FREKING MYERS & REUL LLC, Cincinnati, Ohio, for Appellant. Michael J. Hendershot, Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Lee Briggs, a Black man, worked as a compensation analyst for the University of Cincinnati (UC) Human Resources department. In

July 2013, the HR department hired Cassandra Wittwer, a Caucasian woman, in the same position but at a much higher salary than Briggs. Over the next several years, Briggs's pay stagnated while Wittwer's rapidly increased. Briggs contends that after he submitted a claim of discrimination, UC retaliated by revising a job posting for which he had been encouraged to apply so that he was no longer eligible. Briggs sued UC, asserting claims of wage discrimination on the basis of race and sex, and retaliation for filing his complaint. The district court granted UC's motion for summary judgment. Because there remain genuine disputes of material fact as to Briggs's claims, we **REVERSE.**

## I.  BACKGROUND

### A.  Factual Background

The facts are presented in the light most favorable to Briggs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In November 2011, Briggs, having previously worked in two other benefits departments, began working as a Benefits Generalist in UC's HR Department, with a starting salary of $39,000. In October 2013, he became a Compensation Analyst, reporting to Ken Stidham, Director of Compensation, and his salary increased to $43,000. Briggs received a two percent across the board annual raise in each of the two subsequent years, and by the summer of 2015 he was earning $44,737.20 per year.

That July, Stidham and the interim chief HR officer, Peg Buttermore, hired Cassandra Wittwer, a Caucasian woman, as a Compensation Analyst. Wittwer had no prior compensation experience; she had been working at UC's College-Conservatory of Music (CCM), earning a salary of $48,066.48 per year. According to Stidham, the Compensation Analyst position was a promotion from Wittwer's previous position, and so university policy required HR to give her a minimum salary increase of 5 percent. Wittwer was ultimately hired at a salary of $53,000, a 10.2 percent increase over her previous salary. Various explanations have been provided for that starting salary: in an affidavit submitted during this litigation, Stidham said it was because Wittwer "came with outstanding recommendations" from CCM and from others in Human Resources, and that after an interview, he was "very impressed by her." At his deposition,

Stidham said he "believe[d]" Wittwer had said she would not leave her previous position unless HR offered her $53,000. Stidham testified that he knew there was a significant gap between Wittwer and Briggs's salaries, but he could not close the gap because of the HR Department's budget; instead, he planned to revisit Briggs's salary later.

In August 2015, Tamie Grunow joined the department as the Senior Associate Vice President & Chief Human Resources Officer. In September 2015, recognizing the gap between his and Wittwer's salaries, Briggs submitted to Stidham a request for an "equity adjustment" to his pay pursuant to UC policy. The policy provides that the "Compensation Department has the responsibility to ensure the maintenance of internal pay equity within the internal (UC) and external (industry) market." And an "employee's overall performance rating and scope of responsibility in addition to budget, internal and external market and current placement in salary range may have a direct impact on his/her salary and the ability to receive a salary equity review and adjustment." Under the policy, an employee has the right to seek a "pay equity study" by submitting a written request; the Compensation Department must then "conduct a review, consult with appropriate authority and issue a written determination."

Stidham took the request to Grunow, explaining that he believed Briggs's salary was very low compared to internal and external equivalents. According to Stidham, Grunow did not initiate a review of Briggs's pay, but simply responded "we'll see." Stidham raised Briggs's request for pay equity again at a follow-up meeting; Grunow said she would think about it. Two years later, after Briggs brought his complaint of discrimination, Grunow stated in e-mails that the equity increase had not been supported based on performance concerns raised by Stidham. But at his deposition, Stidham denied having told Grunow he did not support the equity increase due to performance and denied Grunow ever told him that she did not support the equity increase.

In June 2016, Briggs received an "Inconsistent" rating for the 2015–16 budget year. The review contained a mix of positive and constructive feedback. Wittwer received a rating of "Exceeds expectations" and positive feedback. In an e-mail in June 2016 to Grunow explaining Briggs's rating, Stidham said that Briggs "wants to do well and has made strides within the last two (2) months," but because the evaluation was for the entire year, Stidham felt he needed to

rate him as "inconsistent." Still, he fully expected that Briggs would "continue to make strides and be meeting expectations by the time we meet for our mid-year reviews."

That fall, Grunow solicited bonus recommendations. Stidham requested a 2.5 percent bonus for Wittwer for exceptional performance, and a 2 percent bonus for Briggs for performing well for most of the year and being instrumental to a FLSA project. When Grunow responded that bonuses were available only to employees who achieved a "Meets expectations" rating, Stidham requested that Grunow consider awarding one to Briggs anyway, explaining that Briggs had received an "inconsistent" because he had been graded on the whole year. Stidham explained that if he looked at what Briggs "has done from January until now, he meets expectations . . . [he] has done tremendously better over the last 10 months . . . there is simply no way I could have finished the FLSA project in the fashion we did without his help." Ultimately, Briggs received a $500 bonus, the lowest in the department; other HR employees received bonuses ranging from $800 to $4,000. Wittwer received a bonus of $1,200. Around the same time, Wittwer received a new job title, Compensation and HR Operations Analyst, although her base pay and responsibilities remained the same.

In June 2017, Briggs received a rating of "Meets expectations," with positive feedback, while Wittwer received a rating of "Meets+" expectations. That summer, the executive director of HR left the department, and Grunow decided to use the savings to reclassify several employees and increase their salaries. Wittwer was among those reclassified and was designated Compensation & HR Operations Lead in September 2017, with an associated 7 percent salary increase. According to Briggs, none of the individuals who were purportedly reclassified are male, and only one is Black. Briggs was not reclassified, but after he put in an equity request in August 2017, he received an adjustment of 3.3 percent, bringing his salary to $48,110.40. He contends, however, that he, along with two other employees, received the lowest raise among the HR employees who were subject to the reorganization. In October 2017, Briggs received a 2 percent bonus of $962, while Wittwer received a 3 percent bonus of $1,700.

In November, Wittwer was reclassified to HR Application Specialist, a non-compensation role, and her salary was increased to $62,055. After Wittwer's departure from the compensation section, the HR Department decided to "backfill" her role with a senior

compensation analyst. Stidham discussed the proposed job posting with Briggs, encouraging him to apply and assuring him that he met the qualifications for the position.

On November 6, Stidham e-mailed Grunow a proposed job description for the senior analyst position with the following minimum qualifications and a proposed pay grade of 16: "Bachelor's degree with three (3) years of experience; -OR- Associates' degree with five (5) years of experience; -OR- seven (7) years of related experience. Experience should be in Compensation and current analytical technology." The next day, November 7, Grunow responded that the description looked "good," but asked for the phrase "should be" to be removed "as we want compensation experience required."

On November 8, 2017, Briggs e-mailed Grunow his complaint of discrimination. In the document, he pointed out several salary and bonus disparities between him and his colleagues and noted that other employees had been reclassified without having to apply, while he was being asked to apply formally to the senior compensation analyst position. The next day, Stidham testified, Grunow came to his office to ask "why [he] was not addressing [the] concerns that were included in the e-mail." She also asked whether Stidham had told Briggs he would get the job; Stidham responded that he had encouraged Briggs to apply but had not promised him the job. According to Stidham, Grunow became angry, raised her voice, and walked out, slamming the door.

The same day, Grunow e-mailed Stidham asking for the history of Briggs's salary, including Briggs's request for an equity increase, and the rationale for the disparity between his and Wittwer's pay. Stidham provided a detailed response that evening. He recounted Briggs's salary history and explained that Wittwer's $53,000 starting salary was approved because Wittwer "came with outstanding recommendations and the planned compensation was $53K per year." Stidham also explained that he and Grunow had communicated about an equity increase on Briggs's behalf in fall 2015, not "due to performance," but "to adjust the salary closer to the market." Stidham noted that two prior female Compensation Analysts had earned $51,000 and $52,269.12, which he said were "close to market averages."

About an hour later, Grunow responded that "[t]he 2015 equity increase was not supported by you or me due to performance, production and error concerns that were brought to my attention," and that an insufficient rating was documented that year. She asked Stidham to provide her with a copy of Briggs's 2015–16 review containing the "inconsistent" rating. Finally, she explained her view that the open senior compensation analyst position required technical expertise, critical thinking, a high level of compensation experience, and communication skills.

On Monday, November 13, following a long weekend, Grunow told Stidham by e-mail to "hold on the posting for Sr. Comp. Analyst" so she could better "understand some of the differentials between the Comp positions" and ensure the new hire would fill the necessary "gaps." Stidham responded that they could "backfill this as a Comp Analyst and . . . incorporate the reporting, Success Factors duties, etc. into the normal duties and responsibilities." In reply, Grunow reiterated that she wanted an "experienced" senior compensation analyst and believed "at this level a Bachelor's degree should be required" based on her review of "what the market would support." She suggested they meet the next day before posting the position to sort out the disagreement.

On November 14, Grunow, Stidham, and Briggs met to discuss Briggs's complaint, with Stidham serving as Briggs's third-party representative. According to Stidham, Grunow spent most of the meeting refuting Briggs's allegations. Grunow asserted that Wittwer had come in with knowledge and experience that Briggs lacked, and questioned whether Briggs was doing the same types of higher-level tasks that Wittwer had been doing. Briggs said he had been doing the same tasks, which Stidham agreed were "typical comp analyst work." After the meeting, Grunow sent Stidham an e-mail asserting that she had reviewed Briggs's resume and concluded that he "was not qualified for the Comp position" when he was placed in that role four years earlier.

On November 15, Briggs notified UC's Office of Equal Opportunity & Access (OEOA) of his concerns regarding discrimination and retaliation.[1]  A few days later, Grunow sent Briggs an e-mail further responding to his complaint, contending that he did not understand department policies and was behaving inappropriately.

On November 21, Grunow told Stidham by e-mail that the senior compensation analyst position needed to be at the "manager level"; Stidham disagreed.  The Department eventually posted the position with the job title "Senior Compensation & Performance Analyst," at a pay grade of 19, and a bachelor's degree required.  Stidham believed this position's compensation range was too high and "raise[d] internal and external equity concerns."  Grunow testified that she believed the senior compensation analyst role required technical knowledge and a high skill level.  UC ultimately hired Rebecca Douglas, a Caucasian woman, for the job, at a salary of $76,000.  Douglas left less than a year into her employment and was not replaced.

Stidham contended that he suffered negative consequences as a result of his advocacy on Briggs's behalf.  On November 21, he had a one-on-one meeting with Grunow, who told him he was "not a good manager" and that he was "dishonest, and not trustworthy" and a poor communicator.  Soon afterwards, Stidham learned that the open senior compensation analyst position would not report to him, the Director of Compensation, but to the "Central HR Administrator," i.e., Grunow.  Grunow also directed Stidham to attend a management communication course (which he had already taken the previous year), and in February 2018 issued him a written warning—the first disciplinary action he had received during his tenure at UC.  Stidham filed his own retaliation claim in February 2018.  In June 2018, Stidham's reporting structure was changed—he began reporting to Elizabeth Aumann, a subordinate of Grunow's, rather than Grunow herself.

**B. Procedural History**

Briggs filed his complaint on August 6, 2018.  He filed an amended complaint on October 9, asserting claims of gender-based wage discrimination and retaliation under the Equal

---

[1]OEOA conducted an investigation and eventually concluded that the HR department had not violated University policies.

Pay Act, and claims of race- and gender- based wage discrimination and retaliation under Title VII of the Civil Rights Act of 1964. UC answered and on November 27, 2019, moved for summary judgment. The district court granted the motion in full on September 28, 2020, and Briggs timely appealed.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo. *See Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine dispute of fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). In conducting this analysis, we do not judge credibility or weigh conflicting evidence; instead, we believe the evidence of the nonmoving party, and draw "all justifiable inferences" in his favor. *Id.* at 255; *see also Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

### A. Wage Discrimination Claims

#### 1. The Equal Pay Act and Title VII

Briggs brings wage discrimination claims under two distinct statutes, the Equal Pay Act and Title VII of the Civil Rights Act of 1964, contending that he was paid less than his coworkers and passed over for promotion because of his race and sex.

The Equal Pay Act prohibits employers from discriminating against an employee on the basis of sex by paying lower wages than are paid to employees of the opposite sex for performing equal work, "except where such payment is made pursuant to: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C § 206(d)(1). Courts apply a three-step analysis to EPA claims. First, "to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to

employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Schleicher v. Preferred Sol'ns, Inc.* 831 F.3d 746, 752 (6th Cir. 2016) (quoting *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006)). A showing of discriminatory intent is not required. *Id.* (citing *Beck-Wilson*, 441 F.3d at 460). Second, the defendant must prove by a preponderance of the evidence "that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act." *Id.* The fourth exception, the catch-all, relied upon by UC in this case, permits a "factor other than sex" to be an affirmative defense only if, "at a minimum, [it] was adopted for a legitimate business reason." *Beck-Wilson*, 441 F.3d at 365 (quoting *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988)). The defendant bears the ultimate "burden of persuasion and production on its affirmative defenses." *Id.* at 364–65. So, on a motion for summary judgment, if the defendant carries its heavy burden of proving its affirmative defenses, the plaintiff must produce evidence creating a triable issue of fact as to whether the defendant's proffered explanation was pretextual—the third step. *Schleicher*, 831 F.3d at 753. Thus, we may uphold the district court's grant of summary judgment against Briggs "only if the record shows that [UC] established the ["factor other than sex"] defense so clearly that no rational jury could have found to the contrary." *Schleicher*, 831 F.3d at 753 (quoting *Beck-Wilson*, 441 F.3d at 365).

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII claims based on circumstantial evidence of discrimination are analyzed under the familiar three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "[O]n a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390–91 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing his or her prima facie case by demonstrating that "(1) he or she was a member of a

protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 707 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). For claims of gender discrimination, a legitimate non-discriminatory reason may include one of the affirmative defenses set forth in the EPA. *Beck-Wilson*, 441 F.3d at 369 (citing *Washington Cnty. v. Gunther*, 452 U.S. 161, 167–71 (1981)). Finally, the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination. *Wright*, 455 F.3d at 707–08. When the burden shifts back to the plaintiff, "he must come forward with evidence that the defendant's reason for the employment action is false," but he "need not present independent evidence that the proffered reason is pretext for [] discrimination." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")). The employer bears the burden of production at the second step, but the employee bears the ultimate burden of production and persuasion. *Hicks*, 509 U.S. at 507–08.

UC does not dispute the wage differential between Briggs and Wittwer, assuming on appeal that Briggs has made out a prima facie case under both Title VII and the EPA. UC argues that the wage differential was the result of several factors unrelated to race or sex, including Wittwer's experience and qualifications. So, with respect to the EPA, we ask whether UC has proven that the wage differential was based on a factor other than sex that was applied for a legitimate business reason; with respect to Title VII, we ask only whether UC has produced

evidence from which a reasonable jury could infer it had a legitimate, non-discriminatory reason for its actions.[2] We address each claim in turn.

      a. *Briggs's EPA Claim*

UC points this court to five factors that it contends justify the pay differential: (1) Wittwer started her employment at a higher salary than Briggs because she had demanded that salary as a condition of her employment; (2) Briggs consistently scored below Wittwer on performance reviews; (3) Wittwer and Briggs had different skills and responsibilities; (4) Briggs and Wittwer had different attitudes about self-improvement; and (5) Wittwer had a bachelor's degree and Briggs did not.

Stidham testified that the Compensation Analyst position was a promotion from Wittwer's previous role, and so university policy required HR to give her a minimum salary increase of 5 percent. But her eventual starting salary of $53,000 was 10.2 percent higher than her previous salary of $48,066.48. Stidham also testified that he "believe[d]" Wittwer had said she would not leave her previous position unless HR offered her $53,000. This testimony—uncertain even on its own terms—is not conclusive of UC's argument that Wittwer conditioned her acceptance of the offer on the higher salary. Moreover, Stidham's other statements reflected different reasons for Wittwer's higher salary. In his affidavit of August 2019, Stidham stated only that Wittwer "came with outstanding recommendations" from CCM and from others in Human Resources, and that after interviewing her he was "very impressed by her." Similarly, when Grunow requested an explanation and history of the salary differential between Briggs and Grunow, Stidham responded by e-mail dated November 9 explaining that a salary of $53,000 for Wittwer was approved because she "came with outstanding recommendations." In neither document did he claim Wittwer had demanded the higher salary. The inconsistencies between Stidham's deposition testimony and his other statements create issues of fact as to whether Wittwer's starting salary was the result of her prior salary, her demand for a higher salary, or

---

[2]As caselaw makes clear, the Title VII and EPA analyses may overlap for wage discrimination claims, but they are not, as the district court believed, coterminous. Because the burdens of production and persuasion are allocated differently in the two types of claims, a defendant's evidentiary showing that falls short of proof at the second step has a different impact for each claim: in an EPA claim, summary judgment will be denied, whereas in a Title VII claim, the burden then shifts to the plaintiff to produce evidence supporting pretext.

other factors.  And although Grunow stated in her response to the OEOA that Wittwer was hired into her starting salary "to attract her to accept the position," Grunow was not involved in hiring Wittwer.

In any event, no authority supports the concept that an employee's prior salary or demand for a specific salary is sufficient in isolation to justify a wage differential.  Such a rule would simply perpetuate existing sex-based pay disparities and undercut the purpose of the Act—to require that those doing the same work receive the same pay.  In the cases cited by Defendant, moreover, multiple other factors supported the new employee's higher pay as compared with the plaintiff's pay.  *See, e.g.*, *Balmer v. HCA, Inc.*, 423 F.3d 606, 613 (6th Cir. 2005) (disparity justified where comparator "asked for a higher salary than Plaintiff, had a higher salary history than Plaintiff, and most importantly, the ultimate decision maker . . . determined that [the comparator] had greater relevant industry history than Plaintiff"); *Foco v. Freudenberg-NOK Gen. P'ship*, 549 F. App'x 340, 345–46 (6th Cir. 2013) (wage differential was based on comparator's prior salary, negotiations, market value, skill, experience, qualifications, and job responsibilities); *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 107–08 (6th Cir. 2006) (employer's "evidence show[ed] that it considered not only prior salaries but also skills and experience that were of value to the company" and that it "paid what was required to recruit" the higher paid employees).

Next, UC contends it has proven that Wittwer had better performance reviews, more skills, greater responsibilities, and a better attitude towards self-improvement than Briggs, as well as a bachelor's degree, which Briggs did not have.  UC claims, for example, that Stidham gave Briggs the lowest performance rating of any employee in the HR department during Grunow's tenure.  UC points also to statements in Stidham's affidavit that he assigned Wittwer more complex and difficult compensation issues that he did not think Briggs could handle, and that Wittwer was "constantly striving to be better" whereas Briggs "balked" at doing anything outside his job description.  In particular, Stidham pointed to Briggs's "inconsistent" Excel skills, issues with Briggs leaving early, and his "problems timely and accurately completing PCRs."

The record tells a more complex story.  Briggs was hired in 2013, Wittwer was hired in July 2015, and Briggs put in his first equity request in September 2015.  It was denied, even

though at a salary of $44,737.20, he was earning substantially less than Wittwer, who was being paid $53,000, and less than two prior female compensation analysts, who had earned $51,000 and $52,269.12, respectively.  Yet the record contains no evidence of his performance from that period, aside from Grunow's post-complaint statements that the equity request was denied due to performance concerns, which directly conflicts with Stidham's statements.  In June 2016, Briggs did receive an "Inconsistent" for the 2015–16 budget year, and Wittwer received an "Exceeds Expectations," but UC offers no objective metrics for Briggs's performance to support these subjective ratings.  And the review contains positive feedback for Briggs from Stidham that contradicts Stidham's post-deposition affidavit, such as that Briggs had "the right attitude and is more than willing to learn to better himself," was "more than willing to work with data operations and the front desk on providing good customer support to students and employees," and was regularly given the department's salary requests because Stidham "kn[e]w he will complete the[m] both accurately and on time."  Stidham also observed that the fact that Briggs was "slightly behind from a technical skillset" was not "necessarily [his] doing, as he was asked to be at the forefront of PCR restructuring/testing and Non-Recruitment event submittals."

In a June 2016 e-mail to Grunow explaining the rating, Stidham stated that Briggs "wants to do well and has made strides within the last two (2) months," but because the evaluation was for the entire year, Stidham felt the "need" to rate him as "inconsistent."  Still, he fully expected that Briggs would "continue to make strides and be meeting expectations by the time we meet for our mid-year reviews."  Similarly, in advocating for Briggs to receive a bonus that year, Stidham explained to Grunow that Briggs had received an inconsistent because he had been graded on the entire year.  But had he looked at what Briggs "has done from January until now, he meets expectations . . . [he] has done tremendously better over the last 10 months . . . there is simply no way I could have finished the FLSA project in the fashion we did without his help."

In June 2017, Stidham awarded Briggs a rating of "Meets expectations," and awarded Wittwer a "Meets+" rating.  In the 2017 review, Stidham stated that Briggs had improved his organizational skills, was increasing his "job knowledge," was good at problem-solving, had an "outstanding" demeanor, and had "the right attitude AND drive to be able to continue to learn and advance in compensation."  Stidham reported that Briggs completed all salary surveys and

deliverables on time, effectively performed his job duties, and was "willing to collaborate and perform in other areas of central HR." In November 2017, Stidham told Grunow that he had to "applaud [Briggs's] willingness to continually learn and improve in Compensation Administration." And although UC claims in a conclusory fashion that Wittwer had greater responsibilities than Briggs, the record shows that both Briggs and Stidham agreed that the two compensation analysts were doing the same tasks.

Taken together, all these inconsistencies create issues of fact as to UC's claim that Wittwer was more qualified, more skilled, and had more advanced responsibilities than Briggs. But perhaps more importantly, UC has offered no evidence that the purported differences between Wittwer and Briggs actually motivated the disparity in their wages.

The text of the EPA provides that "a factor other than sex" is a legitimate justification for a wage differential where the "payment is made *pursuant to*" that factor. 29 U.S.C. § 206(d)(1) (emphasis added). As our sister Circuits have explained, this language requires an employer to submit evidence from which a factfinder could conclude that the proffered reasons "*in fact*" explain the wage disparity—not just that the reasons could explain it. *Stanziale v. Jargowsky*, 200 F.3d 101, 107–08 (3d Cir. 2000); *see also United States EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 123 (4th Cir. 2018) ("[T]he EPA requires that a factor other than sex *in fact* explains the salary disparity"); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006) (denying summary judgment because "[a]lthough [defendant's stated] reason *could* explain the wage disparity, we cannot conclude, as a matter of law, that it *in fact* explained the wage disparity"). We have also held that to justify a wage differential, an employer must demonstrate that the factor other than sex "was adopted for a legitimate business reason and used reasonably in light of the employer's stated purpose." *J.C. Penney*, 843 F.2d at 253 (citing *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982)). "'Illusory,' 'post-event justification[s]' for unequal pay for equal work" are not valid factors on which a wage differential may be based. *Odomes v. Nucare, Inc.*, 653 F.2d 246, 252 (6th Cir. 1981) (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1047 (5th Cir. 1973)).

Though a defendant need not offer contemporaneously *produced* evidence of its rationale, there must be evidence in the record *proving* that the employer's proffered justification

was the reason for the wage differential's existence. UC's pay equity policy provides that performance ratings and responsibilities "may" impact an employee's salary and pay equity requests, but Defendant offers no evidence to prove they actually did in Briggs's case. Stidham's affidavit contains no statement that the purported deficiencies in Briggs's performance, or Wittwer's purported excellence, were the basis for the persistent and significant difference in their salaries, the denial of Briggs's equity request, Wittwer's repeated reclassification, and Briggs's stagnation in the HR department. Neither Stidham nor Grunow made such statements at their depositions, nor did they provide testimony or documents setting forth the processes and metrics used by the department to set salaries and reclassify employees.

Other evidence in the record, viewed in the light most favorable to Briggs, undermines Defendant's proposed connection between Briggs's alleged performance and his pay. At his deposition, Stidham stated that when he hired Wittwer, he knew there was a gap between her and Briggs's salaries and that he hoped to close it when the budget permitted. According to Stidham, in practice equity adjustments are made based on external and internal market rates, not performance. So, when he brought Briggs's equity request to Grunow's attention in 2015, he explained that he believed Briggs's pay was very low compared to both internal and external equivalents. According to Stidham, Grunow failed to initiate a pay equity review, instead responding "we'll see," and tabled the request at that time and at a follow-up meeting. Then, in 2017, after Briggs e-mailed his complaint, Grunow asked Stidham for the rationale for Briggs's starting salary, Wittwer's higher starting salary, and Briggs's 2015 equity request. Stidham did not mention the performance of either employee. Instead, he recounted Briggs's and Wittwer's starting salary and yearly across-the-board increases. He also recalled communicating with Grunow about a possible equity increase for Briggs, not "due to performance," but "to adjust the salary closer to the market," noting that previous female compensation analysts had also had higher salaries than Briggs, at $51,000 and $52,269. Grunow disagreed with Stidham's explanation: "[T]he 2015 equity increase was not supported by you or me due to performance, production and error concerns that were brought to my attention." Similarly, in her statement to OEOA, Grunow claimed that Briggs's equity request was denied because Stidham told her Briggs "was not meeting job responsibilities entirely."

The record does not show beyond dispute that Wittwer's bachelor's degree and higher performance ratings than Briggs, or any other specified factors, were the reason for the salary disparity between her and Briggs.  UC has therefore failed to meet its burden of proving that these distinctions were "the reason for the pay disparity." *Vehar v. Cole Nat'l Grp., Inc.*, 251 F. App'x 993, 1001 (6th Cir. 2007); *see also* 29 U.S.C. § 206(d)(1).  And because UC did not establish its "factor other than sex" defense "so clearly that no rational jury could have found to the contrary," the grant of summary judgment was inappropriate.  *Schleicher*, 831 F.3d at 753 (quoting *Beck-Wilson*, 441 F.3d at 365).

2. Title VII Wage Discrimination

Although UC has not met its burden under the EPA of proving that the wage disparity was based on a factor other than sex, it has satisfied its lower Title VII burden of articulating a legitimate business explanation for the disparity, supported by some evidence.  The burden accordingly shifts to Briggs to demonstrate that the reason is pretextual.  One way a plaintiff can establish pretext is by "an indirect evidentiary showing that the employer's explanation is not credible." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002).  The record contains no contemporaneous evidence that the cited distinctions between Wittwer and Briggs actually motivated their salary disparity, and it contains disputes of fact among UC's own witnesses as to whether performance is, in practice, a consideration for employees' base pay.  The post-hoc nature of the justifications contained in Stidham's affidavit further support an inference of pretext, particularly given that several of the statements contradict statements made by Stidham in Briggs's performance reviews and cannot be squared with the undisputed fact that Stidham recognized Briggs's pay was below market and requested an equity adjustment for him. "An employer's  changing rationale for  making  an  adverse  employment  decision  can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996); *see also Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 482 (6th Cir. 2012) ("Although . . . there is evidence in the record of dissatisfaction with Gaglioti's work . . . this justification was never raised by Levin Group until well into the litigation . . . the jury [could] view the performance argument as a litigation strategy, as opposed to the real reason for the action").

A plaintiff's discrimination claim survives summary judgment when the record contains "enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007)). The record here contains evidence that defeats UC's motion on the Title VII claim; the grant of summary judgment must be reversed.

**B. Retaliation Claims**

According to Briggs, the "gravamen" of his retaliation claims is that after he complained to Grunow about discrimination, Grunow retaliated against him by pulling and altering the job description and requirements for the senior compensation analyst position. Before the district court, UC argued that it was entitled to summary judgment because Grunow "honestly believed" that Briggs was not qualified for the pulled posting, and "there [was] no evidence of pretext"—an argument addressing the final stages of the burden shifting analysis. UC's reliance on this argument presumes that Briggs made out a prima facie case of retaliation.

The district court granted summary judgment for two reasons. First, it found that Briggs could not show a causal connection between his complaints of discrimination and Grunow's decision not to hire him because the day before Briggs made his complaint of discrimination Grunow had approved a job posting requiring seven years of compensation experience for those without a degree, which the court found excluded Briggs. Second, the court found UC had established that it "believed in good faith [Briggs] was not qualified for" the position, and so could not be liable for retaliation. On appeal, Briggs contends that the district court erred in granting summary judgment based on grounds not raised by the moving party—the causation element of Briggs's prima facie case—and in concluding that UC had established as a matter of law that it could not be liable under the honest belief rule.

Federal law prohibits employers from retaliating against employees for filing complaints of discrimination under Title VII, 42 U.S.C. § 2000e-2(a), or of unequal pay for equal work under the EPA, 29 U.S.C. § 215(a)(3). Claims asserting retaliation based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543–44 (6th Cir. 2008); *Adair v. Charter Cnty. of*

*Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). To establish a prima facie case of retaliation, a plaintiff must establish that he (1) "engaged in a protected activity"; (2) his "exercise of such protected activity was known by the defendant"; (3) the defendant subsequently "took an action that was 'materially adverse' to the plaintiff"; and (4) "a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

The district court first concluded that Briggs could not make out a prima facie case because there was no causal connection between his complaint and Grunow's decision to change the job description. But UC never challenged Briggs's prima facie case. And it is well-established that before granting summary judgment "on grounds not raised by a party," that party must be provided "notice and a reasonable time to respond." *George v. Youngstown State Univ.*, 966 F.3d 446, 467 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(f)(2). This is because "a district court does not have before it the full factual record developed by the parties in discovery. Rather, a party opposing summary judgment will supply only the evidence needed to demonstrate a genuine dispute as to the issues raised in the motion." *Id.* Because UC had not disputed Briggs's prima facie case, including its causation element, the district court should not have granted summary judgment on that ground.

UC argues that it did place causation in issue because it raised the "honest-belief defense" which "is inextricably related to causation," (citing *Banks v. Bosch Rexroth Corp.*, 610 Fed. App'x 519, 533 (6th Cir. 2015); *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 351 (6th Cir. 2013)). But as explained below, in the context of the evidentiary burdens borne by the parties under the *McDonnell Douglas* framework, the honest belief rule serves to "rebut the plaintiff's evidence of pretext" at the third step of the analysis. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007); *see also Tillman*, 545 F. App'x at 351. Tellingly, UC discussed the honest belief rule as part of its argument that Briggs had failed to show pretext, and the cases it cited in support were decided at the pretext step of the *McDonnell Douglas* framework. It was improper for the district court to sua sponte resolve this case on an element of the prima facie case that Briggs had not had the opportunity to litigate.

As to the merits, the record contains e-mail evidence indicating that Grunow did not know how much work experience Briggs had at the time she pulled the posting, as well as circumstantial evidence that makes a retaliatory motive plausible, such as Grunow's anger that Briggs had filed a complaint, and the fact that she pulled the job posting almost immediately afterwards. That is enough to meet Briggs's "minimal" burden at the prima facie stage of providing evidence "to deduce a causal connection between the retaliatory action and the protected activity." *Imwalle*, 515 F.3d at 550–51 (quoting *EEOC v. Avery Dennison*, 104 F.3d 858, 861 (6th Cir. 1997)).

Once a plaintiff makes out a prima facie case, the defendant bears the burden of articulating a legitimate, non-retaliatory reason for its action, supported by admissible evidence. *Rogers*, 897 F.3d at 777. If the defendant does so, the burden shifts to the plaintiff to demonstrate that the proffered reason is "actually a pretext to hide unlawful retaliation." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007)). At the summary judgment stage, a plaintiff meets this burden when he "produce[s] evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Id.* (quoting *Michael*, 496 F.3d at 597).

Plaintiffs ordinarily show pretext "by showing that the proffered reason[] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 790–91 (6th Cir. 2006); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994). Under the honest belief rule, a pretext argument falling into the first category—asserting that the reason given by the employer has no basis in fact—may be defeated by conclusive evidence that the defendant "honestly believed" its proffered reason, and that the belief was reasonably based "on particularized facts that were before it at the time the decision was made." *Clay*, 501 F.3d at 714 (*Wright*, 455 F.3d at 708). If there is sufficient evidence for a reasonable jury to find the employer did not have an honest belief in its proffered reason that was based on a proper investigation, summary judgment must be denied.

So, the honest-belief rule gives a defendant the opportunity to rebut a plaintiff's third-step argument that the defendant's proffered reason for the adverse action lacks a basis in fact and is therefore pretextual. But UC has not articulated a legitimate, non-retaliatory reason for altering the job posting that Briggs could then argue is true or false. Instead, it improperly skips to the third step of the *McDonnell Douglas* analysis, disputing Briggs's evidence of retaliation under the guise of the honest-belief defense without having satisfied its own second-step burden.

Briggs is entitled to demonstrate pretext in multiple ways beyond showing that UC's proffered reason is "mistaken," including, for example, by showing that the reason "did not actually motivate the adverse employment action." *Joostberns*, 166 F. App'x at 791. This record contains evidence from which a reasonable jury could conclude that Grunow's alteration of the posting was retaliatory rather than innocent. Contemporaneous e-mails and other evidence suggest that Grunow's decision-making about Briggs's complaint and the job posting were linked. Briggs made his complaint on November 8. That evening, at 8:31 p.m., Grunow sent an e-mail to herself with the subject line "Ken" containing numbered notes about Stidham and Briggs, including that Stidham "[t]old Lee he is more than qualified for a Sr analyst in Comp vacancy." The next day, according to Stidham, when Grunow came to Stidham's office the first thing she did was ask why he had not already addressed Briggs's complaints. She then asked: "Did you tell Lee that if there was a Sr. Compensation Analyst position that he would get the job?" Stidham responded, "No, I didn't tell Lee that he would get the job, but I did encourage him to apply for it, and why would I not?" According to Stidham, "Grunow was visibly angry and walked out of my office," slamming the door behind her. One of the OEOA investigators also testified that Stidham said Grunow had asked whether he told Briggs he was getting the senior compensation analyst position. Later on November 9, Grunow e-mailed Stidham again pointing out Briggs's purported performance issues, and explaining that the open senior compensation analyst position required technical expertise, critical thinking, a high level of compensation experience, and communication skills.

Then, on November 13, Grunow e-mailed Stidham directing him to pull the senior compensation analyst job posting. Although in retaliation cases "temporal proximity cannot be the sole basis for finding pretext," it can be "a strong indicator of pretext when accompanied by

some other, independent evidence." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) and *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)).  Grunow's comment to Stidham and her notes to herself provide such evidence, as do Stidham and Briggs's testimony that she was upset about Briggs's complaint.  In addition to the anger she displayed during her conversation with Stidham on November 9, when she met with Stidham and Briggs on November 14, Briggs described her as "defensive and accusatory," and said Grunow accused him of throwing his discrimination claim around lightly.  Stidham also testified that Grunow was "defensive" at the meeting.  On November 18, Grunow sent Briggs a follow-up e-mail contending that he misunderstood department policies, and stating that:

> When you communicated your opinions due to what you see in the systems and your comment that others agree with your opinions or perceptions as well as share their own with you this is inappropriate and concerning.

> When gossip and opinions of co-horts, especially in HR occur, in relation to other staff roles involving pay and responsibilities this is a very serious risk to liability and the credibility of Central HR.

Grunow's e-mail also contained language indirectly suggesting that Briggs lacked the skills necessary to advance in the department or to qualify for currently posted or soon to be posted positions.[3]  A reasonable jury might read these comments as evidence that Grunow was displeased that Briggs had made a claim of discrimination and was attempting to obstruct his application to the newly posted position.  This inference would be legitimate even if Grunow

---

[3]Specifically, she stated:

> The HR Office has current vacancies posted or soon to be posted to meet critical areas of responsibilities.  As you know, several HR staff accepted external opportunities that require reassessment as these changes occur.  Sr. Leadership supported a transfer from BCS to HR for three training staff and recently supported one staff moving from HR to BCS to further create greater collaborative alignments.  Our office is experiencing not only many large initiatives but also staffing simultaneously and this can be very challenging.  IT will also lead to future growth opportunities that we look forward to for Central HR.

> As we discussed at our meeting together with your Director, there are many factors that impact pay and advancement for career options some of these include:  current knowledge, skills, abilities, accuracy, proficiency, education internal and external market drivers.  Also, important factors:  initiating action steps for problem solving, seeking certifications, new skill development, performance, professionalism all examples that contribute to individual success and goal achievement.

honestly believed Briggs lacked seven years of compensation experience; a reasonable jury might conclude she wanted to make clear that Briggs should not apply to the new position.

Even if the honest belief defense had been properly invoked here, the record contains evidence that at the time she pulled the posting, Grunow did not have an honest belief that Briggs lacked the requisite experience that was based on particularized facts that were before her. *See Smith*, 155 F.3d at 807. In her affidavit, Grunow states that "[W]hen I authorized the posting of the senior compensation analyst on November 7, I did not believe that Briggs was qualified for the senior compensation analyst job because he did not have the required 7 years of experience." But on November 9, the day after Briggs e-mailed his complaint to Grunow, Grunow sent Stidham an e-mail that read, in part:

> Please provide me records of rationale that existed before I began here in 2011 for Lee Briggs starting salary at UC and whether he was moved, applied for or reorganized to the position in Compensation and his salary starting in Comp 2013.
>
> I will need to understand the rationale for the difference in salary for a hire that started at $53,000 in 2013 (I believe that was Cassandra but not sure) and if this was the same position that Lee was in at that time.

A reasonable jury could infer from that message that as of November 9, Grunow lacked knowledge of particularized facts about the nature or extent of Briggs's work experience in compensation from which she could have formed an honest belief. Further supporting that conclusion is Grunow's e-mail to Stidham on November 15, stating that she had now "reviewed Lees resume and experience. It appears that Lee was hired in benefits due to his experience in Benefits and was not qualified for the Comp position without a degree or required Comp years of experience in lieu of degree." But the record indicates Grunow did know that Briggs lacked a bachelor's degree: Briggs had openly been working toward that degree while he was employed in HR. In an e-mail to Briggs on November 18 addressing his complaint, Grunow wrote that she had been "supportive by approving the class load over the threshold upon your request" and had provided him with "schedule flexibility."

A jury might conclude, therefore, that in pulling the posting on November 8, Grunow intended to add a qualification that she knew for certain Briggs did not possess. Grunow's comment on November 15 that Briggs was unqualified for the position he had already occupied

for several years might further support that inference by suggesting she was looking for additional reasons to exclude him from the new position. Indeed, this Court has held repeatedly that the post-hoc nature of a justification "can create a genuine dispute of material fact on the issue of pretext." *Amos v. McNairy Cnty.*, 622 F. App'x 529, 540 (6th Cir. 2015) (collecting cases); *see also Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 436 (6th Cir. 2009) ("We have held that when an employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext.").

UC has not articulated a legitimate, non-retaliatory reason for its adverse employment action. Even if it had, the record contains ample evidence from which a reasonable jury could find it pretextual. UC's attempt to invoke the honest-belief rule does not defeat that conclusion. Summary judgment on this ground was inappropriate.

## III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings in accordance with this opinion.