NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0179n.06

No. 21-5447

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Apr 28, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JO ANN BARNARD, | ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| POWELL VALLEY ELECTRIC COOPERATIVE, | ) ) ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Jo Ann Barnard, the Director of Finance and Accounting at Powell Valley Electric Cooperative (PVEC), brought claims against her employer, alleging wage discrimination under the Equal Pay Act (EPA) and the Tennessee Human Rights Act (THRA), and retaliation for her engagement in protected activity under the EPA, THRA, and the Tennessee Public Protection Act (TPPA). The district court granted summary judgment to PVEC. Based on our analysis herein, we **AFFIRM**.

## I. BACKGROUND

### A. Factual Background

PVEC is a consumer/member-owned rural electric cooperative, headquartered in New Tazewell, Tennessee. In 1991, PVEC hired Barnard as its Director of Finance and Accounting, a position that she held for 25 years until her termination on January 6, 2017. In that role, Barnard reported to the General Manager, Randall Meyers, and Meyers reported to PVEC's Board of

Directors and the Company's President, Roger Ball. Her "job objective" in that role was "[t]o plan, organize, direct, coordinate, and control the total accounting and financial functions of [PVEC]."

PVEC pays its employees pursuant to a Wage and Salary Plan, which establishes grades for each position in the organization and a corresponding set of merit steps, ranging from 1 to 7, for each job grade. Barnard was hired at step 5 of pay grade 13, amounting to an hourly wage of $19.13 or approximately $40,000 per year. She does not dispute that this initial placement was not discriminatory. By 1993, Barnard had received two step increases, bringing her to step 7 of pay grade 13. She claims that prior to 1993, however, Meyers sexually harassed her, and she received those raises while that conduct persisted. But in late 1993, when Barnard put an end to that conduct, her merit raises ceased, and for the next 23 years, she did not receive a single merit-based raise. Barnard did receive cost of living adjustments each year for the remainder of her career, that she believed to be "generous."

As PVEC's Director of Finance and Accounting, Barnard was part of the core management and executive team. The other members of that team were the General Manager, Randell Meyers, and Director of Special Projects, Gary Hatfield. Hatfield, like Barnard, was also in pay grade 13 in 1991, but he had already reached step 7—by 1993, both were at pay grade 13, step 7 with identical compensation.

In her litigation, Barnard pointed to two other PVEC employees who were paid more than she was at the time of her termination and also reported directly to Randell Meyers: Ronnie Williams and Bo Goodin. Williams was hired in 1974, and rose to the position of Crew Leader before being promoted to Area Supervisor in 1993. In that capacity, Williams was responsible for "supervising and coordinating all activities relating to the construction, operations, and

management of [PVEC]'s electrical system within the Tazwell district, which serves approximately one half of [PVEC]'s members." By the time of Barnard's termination, Williams was paid at grade 14, step 7. Throughout the time frame that Barnard received no merit increases, Williams received seven raises. Goodin was hired as an entry-level Staking Engineer and ultimately was promoted to Assistant General Manager. Barnard admits that she did not know what Goodin does on a day-to-day basis. But the record showed that Goodin's job required "background and experience of working with equipment for an electrical distribution system."

On November 8, 2016, Barnard made a request to Meyers to re-grade her job to a higher grade on the Wage and Salary Plan. She met with him on November 11 to discuss her concerns that she had not received a merit-based pay since 1993 and to inquire about the status of her request to re-grade her job. During that conversation, which Barnard privately recorded, she raised concerns regarding pay disparities between herself and other male managers, systemic sex discrimination in pay involving herself and other coworkers, and concerns about practices she reported to an external auditor earlier that year, which she said were ignored. Barnard described Meyers's demeanor as "defensive and agitated," but Meyer ultimately explained that her request required Board approval. To that end, he coordinated a meeting for Barnard and the Audit Committee of the Board of Directors, which was scheduled to take place on November 28.

That morning before the meeting, Barnard sent an e-mail to President Ball, with copies to PVEC's outside counsel, David Stanifer, and PVEC's outside labor and employment counsel, Britt Smith. It had several attachments, for presentation to the Audit Committee, including a news article about a scandal involving a different company; a document titled "Personal Problems with Randell" that summarized her claims of sex discrimination and pay discrimination; and a document

titled "PVEC Items of Concern," which summarized multiple instances of suspected illegal activity by company executives.

Later that day, Barnard met with the committee. Roger Ball, David Stanifer, and the PVEC Board Vice President David Kindle also attended the meeting, though they did not serve on the committee. Barnard provided each member with the documents she attached to her e-mail, and then presented the materials and expressed her concerns that PVEC was engaged in fraudulent activities. She also claimed that Meyers had sexually harassed her during her employment and sexually assaulted her 23 years ago.

That same day, the full PVEC Board of Directors met for their scheduled meeting. The Board discussed Barnard's presentation to the Audit Committee at length. The Board then voted to place Barnard on "paid administrative leave with full benefits" while "the information she provided could be properly reviewed and considered." The next day, Stanifer communicated that information to Barnard.

On December 9, PVEC's counsel met with Barnard to discuss the possibility of settling her complaint. During their conversation, PVEC's counsel suggested that early retirement could be an option. In an effort to resolve the complaints, Barnard indicated that she was amenable to meeting with the Audit Committee again. A meeting was scheduled for December 15, but Barnard ultimately canceled that meeting.

On December 19, Barnard met with Stanifer and Smith before the Board met for its regularly scheduled meeting. Her meeting lasted three hours, during which Barnard rehashed many of her complaints. In response, Smith stated:

> And here's what I really want to talk to you about today. Okay. I'm afraid, and I can't tell you that I know this, but I mentioned it to you on the phone a little bit, I'm afraid that there's been some damage done to people over at the coop by things that you've said. It includes a number of people other than just Randell. I'm afraid,

but I don't know that, that the Board is not going to be willing to let you come back to work.

(R. 55, Recording of Meeting, at 35:19)

Smith also clarified:

What I'm trying to say is, can you think of anything that you could accept that would not involve you coming back, in other words early retirement, and if the Board would agree to go along with something like, then I would try to get NRECA looking at a supplemental early retirement plan.

(*Id.* at 36:44)

Finally, Smith opined:

What I would love to see is that you retire and that they pay you something that will, if not completely at least partially, for what you feel like you have been cheated out of.

(*Id.* at 46:31)

Barnard left the meeting with the understanding that Stanifer and Smith would meet with the Board later that evening to discuss the next steps and then circle back to Barnard.

Following the Board meeting, Smith contacted Barnard and stated:

About the Board's action Monday night [i.e., 12/19/2016] and I know this is not going to be what you expect, and I know some of it's going to be hard for you. But basically, they determined that they just couldn't see any way that they could bring you back. There's too much damage done and too many things hurt. It really goes beyond that. It's not only Randell, you know, but it is employees. Your subordinates just don't feel that the relationship is very good. I know that's hard to hear, but that's the bottom line and that's what we are trying to deal with. I'm going to ask you now to assume that you can't come back to work. What can we do that it's going to take to make this easier for you? So, what I asked them to do, first of all, and that's why I didn't get you yesterday, was to give me some kind idea on what

your current sick leave payout would be and what your vacation hours payout would be. Can you write down numbers and things as we talk?

(R. 55, Call with Brit Smith, 0:00 to 1:23)  The call concluded with Smith offering Barnard a settlement package.  For the next few weeks, Barnard and Smith exchanged several e-mails until January 5, 2017.

While the email exchanges were underway and while she was on administrative leave, on December 28, 2016, Barnard went to the home of her friend and subordinate employee, Lisa Tarver.  Barnard told Tarver about her ongoing dispute with PVEC and PVEC's response to her complaint.  Barnard asked Tarver to retrieve files from Barnard's work computer that she had been unable to retrieve when she was placed on administrative leave.  Barnard contends that the only documents she sought were a compilation of TVA Retail Rate data that she saved on her computer. But Tarver testified that Barnard handed her a flash drive, requested "all communications with TVA and all retail and wholesale rate data," and instructed Tarver to copy those documents and meet Barnard's husband the next day to give him the flash drive.  Tarver agreed to do so, but testified that it was "just so [she] could get [Barnard] out of [her] house."  Barnard's supervisors found out about the incident when Tarver reported it to Meyers the next day.

On January 6, 2017, Barnard's employment was officially terminated.  The letter says that PVEC discovered issues with Barnard's employment while investigating her complaint, and states the following:

> Such Conduct includes among other issues, (i) pressuring PVEC employees to sneak copies of PVEC's confidential business records to you for your own personal use, (ii) pressuring one of your subordinate employees to copy records after being told by the employee it would violate company directives to do so, (iii) asserting your desire to "take down" the cooperative.

> You also stated to your subordinate employee that you have considered shooting me, the Board Chairman, and other PVEC employees.

(R. 39-26, Termination Letter, PageID 842)  In an interrogatory response, PVEC originally claimed that Barnard was fired during the executive meeting of the Board of Directors, but later amended its response to state that when Ball learned of Barnard's conduct, he consulted with executive members, "obtained consensus for termination," and approved the letter.

Following her termination, Barnard continued to contact her supervisors.  On March 13, 2017, Barnard and her father confronted President Ball in the PVEC parking lot, parking directly behind him so that he could not leave.  Barnard sought to be reinstated, and over the course of the conversation, the two stated:

> Barnard: I mean I've worked my butt of [f]or Powell Valley, granted the last 2 years I've done a lot at WaFloy, but I've got my one-time stuff done there. And my heart and soul is with Powell Valley, I don't want to cause them any harm and whoever said that I was trying to take it down was lying.

> Ball: Well, I never heard any of that. But you know . . . the biggest thing I know is all the stuff that you've handed me.

(R. 57-1 at 18; R. 55, Ball Conversation, 1:40-2:10)  Following the conversation, Barnard brought suit.

### B.  Procedural Background

Barnard sued PVEC, bringing claims of unequal pay in violation of the Equal Pay Act and the Tennessee Human Rights Act (THRA), and alleging that her termination was illegal retaliation under the Equal Pay Act, the THRA, and the Tennessee Public Protection Act (TPPA).  PVEC moved for summary judgment before the district court, contending that Barnard could not prove she was paid differently for equal work; that her complaint was not protected activity under the

relevant statutes to establish retaliation; and that it had a valid, nondiscriminatory reason to terminate her.

The district court granted summary judgment to PVEC on all counts. As to the wage discrimination claim under the Equal Pay Act, Barnard claimed that Goodin and Williams were appropriate comparators because they were also on the management team. The district court began its review with an analysis of the alleged comparators' job descriptions. It explained that Williams's job required technical knowledge of electric utility construction, operations and maintenance; knowledge of and expertise in the National Electric Safety Code and Occupational Health and Safety Administration; performance of duties on a 24/7 basis in adverse weather conditions. Goodin's position required "background and experience working with equipment for an electrical distribution company," and Barnard admitted she does not "have detailed knowledge about what the assistant general manager does." In light of these facts, the district court found that the two men were not viable comparators for her accounting and finance job and thus did not support her equal pay claim.

The district court also concluded that Barnard's claim that "other employees received more raises than she did" could not amount to an Equal Pay Act claim. Relying on the language of the statute, the court concluded that the scope of such claim is limited to "an examination of total salary, not wage growth." And because her THRA claim relied on the same basis of facts, the district court granted summary judgment on that claim, too.

Regarding Barnard's retaliation claims, the district court found that Barnard's several complaints and colloquies with the Board constituted protected activity. But, focusing primarily on Barnard's efforts to obtain confidential company documents from PVEC while on administrative leave, the court found that such conduct constituted a valid, non-discriminatory

reason for her termination. The district court concluded that the reason stated for the discharge was uncontradicted and was consistent with the employer's actions and that Barnard failed to show the proffered reason was pretextual. Accordingly, it granted summary judgment to PVEC on her retaliation claims.

Barnard timely appealed. On appeal, Barnard contests only the district court's grant of summary judgment concerning the THRA equal pay claim and the retaliation claims.

## II.   ANALYSIS

We review the district court's grant of summary judgment de novo. *See Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). In conducting this analysis, we do not judge credibility or weigh conflicting evidence; instead, we believe the evidence of the nonmoving party, and draw "all justifiable inferences" in her favor. *Id.* at 255; *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

### A.    Wage Discrimination Claim

Barnard contends on appeal that the district court "erred by requiring [her] to prove she was paid less for equal work under the Tennessee Human Rights Act." She argues that the district court should have focused on the evidence showing that her merit-based increases ceased after she "put an end" to the sexual advances from her supervisor. PVEC contends that Barnard's THRA claim fails as a matter of law because she conceded that she has no viable claim under the Equal Pay Act. In the alternative, PVEC contends that her THRA claim fails because Barnard failed to establish a prima facie claim and failed to show pretext.

We begin with the interplay between the THRA claim—which is evaluated "similarly, if not identically to Title VII," *see Ferguson v. Middle Tenn. State Uni.*, 451 S.W.3d 375, 381 (Tenn. 2014)—and the Equal Pay Act. "[W]hen an Equal Pay Act claim and a Title VII claim arise out of the same set of underlying facts, both stating a charge of wage discrimination, 'the standards of liability under the two statutes are sufficiently similar,' that the disposition with respect to the two claims should be the same." *Clark v. Johnson & Higgins*, No. 97-4233, 1999 U.S. App. LEXIS 11350, at *8 (6th Cir. May 28, 1999) (quoting *Korte v. Diemer*, 909 F.2d 954, 957 (6th Cir. 1990)). But that does not mean that the analysis is "coterminous." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 509 n.2 (6th Cir. 2021). In *Briggs*, this court explained,

> Because the burdens of production and persuasion are allocated differently in the two types of claims, a defendant's evidentiary showing that falls short of proof at the second step has a different impact for each claim: In an EPA claim, summary judgment will be denied, whereas in a Title VII claim, the burden then shifts to the plaintiff to produce evidence supporting pretext.

*Id.*

In some cases, the theory of liability behind the wage discrimination claim is entirely different under Title VII (or an anti-discrimination statute) than it would be under the EPA. In rejecting the argument that EPA claims necessarily swallow related Title VII claims, the Supreme Court noted that such an interpretation would mean "that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *County of Washington v. Gunther*, 452 U.S. 161, 178 (1981). The Court further explained,

> [I]f an employer hired a woman for a unique position in the company and then admitted that her salary would have been higher had she been male, the woman would be unable to obtain legal redress under petitioners' interpretation. Similarly, if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination.

*Id.* Thus, wage discrimination claims under anti-discrimination statutes, like THRA and Title VII, can involve a different, broader question than the one posed under claims that arise under the EPA (and which may overlap with Title VII): whether "intentional gender discrimination was a substantial factor in the pay equation." *Smith v. Ky. State Univ.*, 97 F. App'x 22, 24 (6th Cir. 2004); *see also Briggs*, 11 F.4th at 509 ("[W]ith respect to the EPA, we ask whether [the employer] has proven that the wage differential was based on a factor other than sex that was applied for a legitimate business reason; with respect to Title VII, we ask only whether [the employer] has produced evidence from which a reasonable jury could infer it had a legitimate, non-discriminatory reason for its actions.")

Barnard contends that the sexual harassment by her supervisor, which she put an end to in 1993, caused her to be deprived of merit-based increases. This argument—that direct discrimination caused her wage deprivation—is precisely the type described in *Gunther* that would divorce Barnard's THRA claim from her EPA-type claim. Accordingly, Barnard's claim does not fail simply because she is no longer pursuing her EPA claim.

We now turn to the merits of Barnard's wage discrimination claim. In evaluating wage discrimination claims under Title VII or related state anti-discrimination statutes, the three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Briggs*, 11 F.4th at 508–09. "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). The district court here did not apply the *McDonell Douglas* framework, instead it granted summary judgment because the EPA claim failed. The district court erred in this regard.

We apply the *McDonnell Douglas* burden shifting framework. The plaintiff bears the initial burden to establish her prima facie case by demonstrating that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was . . . treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). The employee's burden at the prima facie stage is "not onerous" and "poses a burden easily met." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (quoting *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)). Second, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 814. And finally, the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination. *Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). At this third stage, "although [the employee] must come forward with evidence that the [employer's] reason for the employment action is false, [s]he need not present independent evidence that the proffered reason is pretext for [the alleged] discrimination." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")). Importantly, the employer bears the burden of production at the second stage, but the employee bears the ultimate burden of production and persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

As to the first stage, there is no dispute that Barnard has satisfied the first three elements of the prima facie stage; the parties instead quarrel over whether Barnard has satisfied the fourth element. Barnard points to two ways that she was treated differently than similarly-situated, non-protected employees. First, she points to the cessation of her merit-based pay raises, arguing that she received raises while she experienced sexual harassment from the decisionmaker, but as soon as she put an end to her supervisor's unwelcome behavior, she stopped receiving the raises. Second, she contends that other similarly-situated male employees during that same time period continued to receive merit-based pay raises. PVEC addresses only Barnard's second argument, contending that Barnard does not establish a prima facie case because her comparators are not similarly situated—their job titles, duties, and skills are sufficiently different to render them inapposite comparators.

To satisfy the fourth element of the prima facie case, the plaintiff need only show "circumstances which give rise to an inference of discrimination." *Burdine*, 450 U.S. at 253. Our cases have drawn that inference in many ways, including from disparate treatment of similarly situated employees who lack the protected characteristic (known as comparators) or to some factual circumstances that raise reasonable suspicion of an employer's discriminatory motivation behind the adverse employment action. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008); *see also Loyd v. Phillip Bros.*, 25 F.3d 518, 522 (7th Cir. 1994) (cataloguing various methods of establishing an inference of discrimination including: "suspicious timing," "inappropriate remarks," and "comparative evidence of systematically more favorable treatment toward similarly-situated employees not sharing the protected characteristic."). In any case, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action

under circumstances which give rise to an inference of unlawful discrimination." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

The suspicious circumstances to which Barnard directs the court are sufficient to raise an inference of discrimination. PVEC does not dispute that Barnard had not received a pay raise since 1993, nor does it provide evidence to controvert or oppose her claims that the decisionmaker sexually harassed her until she refused his actions in 1993. This suspicious timing—the coinciding of the end of the unwanted sexual harassment and the end of her merit-based raises—is enough to meet the "not onerous" and low bar posed by the fourth element at this stage in the analysis. *Provenzano*, 663 F.3d at 813.

We therefore move to the next stage of the *McDonnell Douglas* framework: whether the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). PVEC has articulated such a reason for Barnard's cessation of merit-based increases: it was following its own Wage and Salary Plan. For the last stage, Barnard "must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Provenzano*, 663 F.3d at 812.

Barnard argues that she has met her burden by showing that PVEC was not following the terms of its Plan. Under the Plan, each job role is assigned a "grade" based on PVEC's determination of the salary range for a position. Each grade has a minimum and maximum salary range, which are distributed over the course of seven steps through which employees progress. Critically, the seventh step represents a maximum salary threshold—the only way an employee can receive higher wages is if the employee is hired into a different job or her existing job is "re-

graded." Re-grading is appropriate only "[w]hen the duties of a position are substantially changed" and by recommendation of the General Manager.

Barnard was hired in 1991 as the new Director of Accounting and Finance, and she began her career at step 5 on the M-13 pay grade. She does not claim that this placement was discriminatory. Over the next two years, she received two merit-based increases, moving her to step 7, the highest step on the M-13 pay grade, by 1993. Barnard has not demonstrated how the sexual harassment she alleges altered the terms of the Plan. Instead, she contends that other male employees who also reported to her supervisor received many merit-based increases over the same period of time.

One crucial detail explains the disparity in merit-based increases that Barnard alleges: neither Goodin nor Williams—the employees to which she points—remained in the same job. Williams was hired in 1991 as a crew leader, he was later promoted to Area 3 Supervisor in 1993, and over the course of that time, he advanced to step 7. Later, the Board of Directors re-graded his position from M-12 to M-14, and he reached step 7 of M-14 in 2014, where his compensation has remained. Goodin began as a staking engineer at M-9, step 1, and he advanced several steps before being promoted to Director of Engineering in 2008. When he was promoted again to the job of Assistant General Manager, a role in a higher grade in 2012, he was placed at step 7, where he too has remained since. So, the merit-based increases that the proposed comparators received are attributable to job promotions and are in accordance with PVEC's Wage and Salary Plan. Based on this record, PVEC was operating according to its Plan's standard protocol. Barnard has not pointed to any evidence in the record to show discriminatory animus.

In any case, neither Goodin nor Williams are proper comparators. The district court initially focused on whether the positions are fungible, stating that courts often "require" a showing of

fungibility, but that statement is inaccurate. Fungibility is simply one way in which compared positions "can support a prima facie case." *Beck-Wilson v. Principi*, 441 F.3d 353, 361 (6th Cir. 2006). Most cases, however, require a detailed analysis of whether the employees performed substantially equal job duties. *See, e.g.*, *Briggs*, 11 F.4th at 511. Such is the case here. Barnard points to one similarity between herself, Williams, and Goodin: they all report to the same supervisor. That aside, the jobs of both men varied markedly from Barnard's. Indeed, Goodin was in a higher position on the organizational charge, and his job required "background and experience of working with equipment for an electrical distribution system." Williams's job required knowledge of electrical utility construction, operations, and maintenance, expertise in the National Electric Safety Code and Occupational Health and Safety regulations, and he was often required to work irregular hours and to respond on a 24/7 basis. Barnard's job as Director of Finance and Accounting, by contrast, requires an entirely different set of skills—"[t]o plan, organize, direct, coordinate and control total accounting and financial functions of the Cooperative," oversee the accounting staff, and generate financial reports. Goodin and Williams had entirely different jobs and duties, requiring different skills from Barnard's, that make them inappropriate for the purposes of comparing compensation in her wage discrimination claim.

For the reasons explained herein, it was proper to grant summary judgment to PVEC on the THRA wage discrimination claim.

### B.     Retaliation Claim

Barnard also brought claims under the EPA, THRA, and TPA, arguing that she was terminated in retaliation for her complaints of wage discrimination and other protected activities. Claims of unlawful retaliation under the EPA and the state statutes all follow the same three-stage, burden-shifting framework employed under Title VII and discussed in the preceding section.

*See Briggs*, 11 F.4th at 514. To summarize, the framework begins with the establishment of a prima facie case; the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason; and finally, the plaintiff must demonstrate that the proffered reason is pretextual. *Id.* at 514–15.

The district court concluded that Barnard established a prima facie case: her detailed letter and presentation to the Board regarding sexual harassment and wage discrimination constituted protected activity, and she was quickly terminated. Shifting the burden to PVEC to articulate a legitimate, non-discriminatory reason, PVEC pointed to the reasons it stated in the termination letter—that Barnard attempted to steal company records and threatened her supervisors. The parties do not contest those conclusions, so the main issue on appeal is the last step of the analysis: whether Barnard demonstrated that the reasons proffered by her employer for her termination were pretextual.

Plaintiffs may show pretext a number of ways: "by showing that the proffered reason[] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 790–91 (6th Cir. 2006) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). Where, as here, the employer proffers multiple reasons for the termination, the employee generally must show that each of the reasons proffered were pretextual. *See Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 478 (6th Cir. 2012) (citing *Smith*, 155 F.3d at 805). But "an employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will 'stick' could easily backfire." *Smith*, 155 F.3d at 809. "There may be cases in which the multiple grounds offered by the [employer] for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of

them so suspicious, that the plaintiff could withstand summary judgment." *Id.* (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995)). And "a multitude of suspicious explanations may itself suggest that the employer's investigatory process was . . . questionable." *Id.*

Here, PVEC offered three reasons in the letter explaining its termination of Barnard's employment: "(i) pressuring PVEC employees to sneak copies of PVEC's confidential business records to [Barnard] for [her] own personal use; (ii) pressuring one of [her] subordinate employees to copy records after being told by the employee that it would violate company directives to do so; and (iii) asserting [her] desire to 'take down' the cooperative." Separate from the three reasons, the letter also states that Barnard was "considering shooting . . . the Board Chairmen, and other PVEC employees." The district court focused primarily on the first reason for termination, finding that Barnard admitted she attempted to take documents and that she knew PVEC did not want her to have those documents; it declined to analyze the remaining proffered reasons.

Focusing on that same reason, Barnard contends that the district court erred because a reasonable jury could conclude that PVEC had already decided to terminate Barnard as early as December 19, 2016. Barnard's admitted actions on December 28, 2016, however, constituted an independent, terminable act that was severable from her protected conduct. Barnard attempts to quell concerns about her request by claiming the documents were relevant to her complaints and were not sensitive or confidential documents. But at that time, there is no dispute that she was on a paid administrative leave that prevented her from accessing documents in PVEC's internal database. Barnard was aware that she could not access or go to the work site to access the documents for herself, an understanding reinforced when she asked her employee to do so and was told that taking the documents would violate PVEC's policies. We have held that an employer may terminate an employee for surreptitiously taking company documents without company

permission, even when those documents may be relevant to a discrimination claim. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 727 (6th Cir. 2008). The reason for Barnard's termination was severable from and unrelated to her protected activity. Based on this independent, legitimate, nondiscriminatory ground for termination, Barnard cannot meet her burden to show that the proffered reason was pretextual. We therefore need not evaluate the remaining reasons and affirm the grant of summary judgment to PVEC regarding the retaliation claims on this ground alone.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.